# EXHIBIT  C

# HARTMAN & CRAVEN LLP

488 MADISON AVENUE
NEW YORK, N.Y. 10022

TEL: (212) 753-7500
FAX: (212) 568-2870
WWW.HARTMANCRAVEN.COM

Michael S. Paradise, Counsel
Direct Dial: (212) 836-4973
msparadise@hartmancraven.com

December 22, 2005

**By Federal Express**

National Futures Association
Arbitration Department
200 West Madison Street, Suite 1600
Chicago, Illinois 60606

Attn: Elizabeth Sheridan, Case Administrator

Re: McCarthey Investments, LLC, et al. v. Linuxor Asset Mgmt., LLC, et al.
NFA Case Nos: 05-ARB-107, 05-ARB-132, 05-ARB-133

Dear Sir or Madam:

With respect to the above referenced arbitration before the National Futures Association, we are the attorneys for Abbas A. Shah, Linuxor Asset Management LLC and Linuxor Capital Management LLC (collectively, "Respondents"). On behalf of Respondents, we submit herewith one original and six copies of each of the following documents:

1. Motion to Dismiss and Answer (with Exhibit) (the"Answer").
2. Affidavit of Abbas A. Shah in support of Respondents' Motion to Dismiss (with Exhibits) (the "Affidavit").

In addition, based on a prior confirmation sent by Edward White, Esq., a partner of this firm, since the claims have been consolidated, we are enclosing a check for $675 payable to the National Futures Association, representing the arbitration service fee.

In order to expedite the adjudication of Respondents' Motion to Dismiss, on behalf of Respondents and pursuant to Rule ¶ 6053.1 of the Code of Arbitration, we request that the Panel schedule a preliminary hearing.

HARTMAN & CRAVEN LLP

National Futures Association
Attn: Elizabeth Sheridan, Case Administrator
December 22, 2005
Page 2


        Please acknowledge your receipt of this letter and enclosures by date stamping a copy of
(i) this letter, (ii) one Answer and (iii) one Affidavit and returning each document in the enclosed
self addressed stamped envelope.

                                        Very truly yours,

                                        *Michael S. Paradise*

                                        Michael S. Paradise

Enclosures

cc: by Federal Express:

        Anthony W. Djinis, Esq.
        Pickard and Djinis LLP
        1990 M Street, N.W., Suite 660
        Washington, D.C.  20036
        (Attorney for Claimants)

        Robert O'Hare, Esq.
        O'Hare Parnagian LLP
        82 Wall Street, Suite 300
        New York, New York  10005-3686
        (Attorney for respondent Adam Bornstein)

IN ARBITRATION
BEFORE
NATIONAL FUTURES ASSOCIATION

-------------------------------------------------------------------X

MCCARTHEY INVESTMENTS LLC, JFM
HOLDINGS, L.P., and 2001 JANE F. MCCARTHEY
GRAT NO. 5,

                           Claimants,

        -and-

ABBAS A. SHAH, LINUXOR ASSET
MANAGEMENT, LLC, LINUXOR CAPITAL
MANAGEMENT, LLC, and ADAM S. BORNSTEIN,

                         Respondents.

:  NFA Case Nos: 05-ARB-107
05-ARB-132
05-ARB-133

-------------------------------------------------------------------X

## MOTION TO DISMISS AND STATEMENT OF ANSWER OF RESPONDENTS ABBAS A. SHAH, LINUXOR ASSET MANAGEMENT, LLC AND LINUXOR CAPITAL MANAGEMENT, LLC TO THE STATEMENT OF CLAIM

Respondents ABBAS A. SHAH ("Mr. Shah"), LINUXOR ASSET

MANAGEMENT, LLC ("LAM") and LINUXOR CAPITAL MANAGEMENT, LLC

("LCM" and collectively with LAM and Mr. Shah, "Respondents"), by their attorneys,

Hartman & Craven LLP, as and for their Motion to Dismiss and Answer to the Statements

of Claim (the "Claims") of MCCARTHEY INVESTMENTS LLC, JFM HOLDINGS, L.P.,

and 2001 JANE F. MCCARTHEY GRAT NO. 5 (collectively "Claimants"), answer as

follows:

I.

## MOTION TO DISMISS THE CLAIMS[1] AS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS UNDER THE NATIONAL FUTURES ASSOCIATION'S CODE OF ARBITRATION

This arbitration is barred by the National Futures Association ("NFA") time period restrictions set forth in Rule ¶ 6035 of the NFA Code of Arbitration (the "Code"). Pursuant to Code Rule ¶ 6035, no claim may be arbitrated by the NFA unless the NFA receives either a claim or a notice of intent to arbitrate within two years of when claimants "knew or should have known of the act or transaction that is the subject of the controversy." The rule further states that the NFA shall reject any claim that is not timely filed and shall terminate the arbitration of such claim without issuing a decision or award. As discussed below, the instant Claims were filed with the NFA on October 25, 2005. Therefore, if Claimants knew or should have known of the acts giving rise to their Claims prior to October 25, 2003, then their Claims are time-barred and must be dismissed.

As procedural background, on August 26, 2005, Claimants initially attempted to file their Claims as a single consolidated proceeding. This constituted a jurisdictional error as the three Claimants owned separate accounts, requiring that they each file individual claims. In cases like this, where claimants with separate claims improperly file all of their claims in a single action, the NFA's filing instructions allow claimants a 20-day grace period in which to file new, separate claims. If claimants fail to correct their error and refile within this grace period, the NFA will automatically reject the filing in its entirety and deem that no claim was ever initiated.

---

[1] Claimants' Claims relate to their commodity pool investments as limited partners in Linuxor Global Macro Fund, L.P., a Delaware limited partnership (the "Fund").

In the instant proceeding, Claimants did not refile their separate Claims until October 25, 2005, nearly two months after their original filing error. Therefore, Claimants' original claim filed on August 26, 2005 must be disregarded in its entirety, and the Claimants' separate Claims must be considered filed no earlier than October 25, 2005.

With respect to Respondents' motion to dismiss, the threshold question for the Panel to decide is: when did Claimants' claims accrue? Specifically, when did the Claimants know or when should they have known of the allegedly fraudulent acts that are the subject of their Claims?

Claimants state in their Arbitration Claim Forms that they first knew a dispute existed on July 9, 2004. This allegation is belied by the fact that no later than August 25, 2003, upon their receipt of their Federal Form 1065 K-1 Schedules (the "K-1 Schedules"), Claimants actually knew that their investments in the Fund had lost approximately 43% in 2002.

However, regardless of when Claimants allege they actually knew of the possibility of a fraud, the law imposes inquiry or constructive notice on Claimants when circumstances would suggest to a reasonable investor of ordinary intelligence that there might be some wrongdoing. *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2nd Cir. 1993) (holding that an inexperienced, uneducated investor was put on inquiry notice of the risk of her portfolio at the moment she was provided with prospectuses explaining the risks even if she did not read or understand them).

Through the doctrine of inquiry notice, courts impute knowledge to the investor regardless of whether he ever actually inquired. In *Sterlin v. Biomune Systems, Inc.*, 154 F.3d 1191, 1203 (10th Cir. 1998), the court stated that Claimants "'need not...

have fully discovered the nature and extent of the fraud before [they were] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself" (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987)). *Phillips v. Levie*, 593 F.2d 459, 462 (2nd Cir. 1979), echoes this proposition: "[C]ommencement of the statutory period does not await a plaintiff's 'leisurely discovery of the full details of the alleged scheme'" (quoting *Klein v. Bower*, 421 F.2d 338, 343 (2nd Cir. 1970)). *See also Dodds v. Cigna Secs., Inc.*, *supra*, at 352 (2nd Cir. 1993).

In this case, Claimants had sufficient knowledge of facts which, in the exercise of reasonable diligence, would have led to actual knowledge, if there had been anything to know. Claimants point to Respondents' allegedly misleading statements and alleged failure to provide timely quarterly and annual financial statements as evidence that Respondents were intentionally concealing the Fund's losses. Assuming, *arguendo*, the truth of this assertion, Claimants were on inquiry or constructive notice of a potential claim as early as July 30, 2002, when they did not receive their first "official" quarterly account statement for the period ending June 30, 2002; or on October 30, 2002, when they did not receive their second consecutive "official" quarterly statement. If Claimants had, as they now allege, insufficient communication with Respondents during their first year in the Fund, then this should have alerted them to the possibility of a claim.

More importantly, in or about August 2002, in a conference call with Philip McCarthey ("Mr. McCarthey"), who was authorized to act on behalf of all three Claimants concerning their Fund investments, and Todd Brashear ("Mr. Brashear"), Claimants' financial adviser, Mr. Shah advised them that the Fund had recently suffered losses of

approximately $3,500,000, or 32% and also discussed his plan for trying to recover them.
During such call, with every right to terminate their investment, Claimants elected to
continue in the Fund, notwithstanding their actual knowledge of the Fund's formidable
losses and of the continued high risk. Claimants cannot now claim, more than three years
hence, that they were shocked to discover continuing losses in the Fund.

Though Respondents assert that Claimants were on inquiry notice in August
2002, the latest possible time that Claimants can reasonably argue that they had inquiry or
actual notice of the facts giving rise to their claims is August 25, 2003, when Mr. Brashear
confirmed to Mr. Shah that Claimants had received their 2002 K-1 Schedules. Moreover,
as indicated by covering letters dated August 12, 2003, the Fund's auditors, Rothstein Kass
& Company, P.C. ("RKC"), mailed Claimants their 2002 K-1 Schedules, copies of which
are annexed as *Exhibit A* to the Affidavit of Abbas A. Shah; and which clearly show that
Claimants had lost 43% of their investments as of December 31, 2002.

Therefore, it is indisputable that Claimants had an accurate picture of the
Fund's poor performance no later than August 25, 2003, as it was unambiguously disclosed
in the K-1 Schedules and was more than sufficient to place a reasonable investor on notice
of a potential claim against Respondents. Claimants allege that they expected healthy
returns on their investments based on Respondents' representations, but discovered instead
at this time that they had suffered dramatic losses. The stark contrast between the reported
staggering losses and Respondents' alleged representations of healthy profits would suggest
to reasonable investors that they should inquire into the possibility of misconduct. As the
United States Court of Appeals for the Second Circuit clearly held, "[W]here the
company's public disclosure reveals that a particular representation about a crucial feature

of an investment has not materialized, the statute of limitations is triggered" *Pilarczyk v. Morrison Knudsen Corp.*, 965 F. Supp. 311, 318 (N.D.N.Y. 1997), *aff'd*, 162 F.3d 1148 (2nd Cir. 1998) (*quoting Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1411 (S.D.N.Y. 1996)).

Losses of this magnitude, the allegedly inconsistent communications and the realization that the Fund was not operating as allegedly promised would have triggered suspicions in reasonable investors in 2002, and certainly no later than the time they received their K-1 Schedules in August 2003. Claimants must be held to this objective standard, especially in light of Claimants' statuses as "qualified eligible persons" pursuant to Rule 4.7 under the Commodity Exchange Act, and their sophistication in investment matters. However, as high risk gamblers, Claimants chose to continue in the Fund, (i) without lodging a single complaint with Respondents or any other party, (ii) without conducting any further inquiry, (iii) without scheduling any meeting to discuss the matter, (iv) without performing any additional due diligence with respect to the Fund or any Respondent, (v) without redeeming all or any part of their investments, and (vi) by rallying behind Mr. Shah and instructing him to continue managing the Fund to achieve the highest rate of return possible, without regard to risk.

Once on inquiry notice, Claimants had a duty to conduct a prompt and diligent investigation to discover the facts giving rise to their Claims. Failing this, Claimants are estopped from seeking redress of their Claims years later.[2]

---

[2] Claimants may not point to Respondents' emails allegedly assuring them that the Fund was recovering to suspend their duty to investigate, because reasonable investors would not have allowed themselves to rely upon and be assuaged by two isolated emails sent several months apart regarding millions of dollars of losses in their accounts.

Claimants may not elect to continue participating in the Fund long after they were on inquiry notice of a possible fraud in the hope that their investments could be salvaged only to file claims later. *See Anixter v. Home Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) (holding that the purpose of the analogous securities fraud statute of limitations is "to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act").

In summary, Claimants filed their claims with the NFA on October 25, 2005, exactly two years and two months after August 25, 2003, the latest time that they can argue that they were on inquiry or actual notice of the acts of which they now complain. Therefore, under Code Rule ¶ 6035, since Claimants failed to bring this arbitration proceeding within two years of being on actual or inquiry notice, this proceeding should be dismissed without decision or award.

Notably, Claimants' failure to file their Claims within the NFA Code of Arbitration's time restraints constitutes a jurisdictional error, meriting the disposal of all of the Claims brought before this Panel, or at the very least, drastically limiting the scope of discovery in these proceedings. No liability claims can be arbitrated that arose more than two years before filing, and there were no losses in the period from August 31, 2003 to August 26, 2005[3], thus the entire arbitration should be dismissed.

In addition to the jurisdictional bar to arbitration of claims more than two years old, the substantive claims under federal securities fraud, federal commodity fraud, securities fraud under Utah law are each barred by the respective statutes of limitation. As

---

[3] As shown in the Affidavit of Abbas Shah and *Exhibit C* thereto, Claimants suffered no losses from August 31, 2003 through the date of their complete redemption in early July 2004. On August 31, 2003, Claimants' investments were worth $3,657,962. In July 2004, Claimants' redeemed investments were worth $4,002,899.

discussed below at pages 19-23, each substantive statute has a strict two year limitation period, which would require the panel to dismiss those claims as a matter of law for all matters which arose more than two years before this claim was filed.

Therefore, in the interests of efficiency for all those involved, Respondents respectfully request that the Panel consider and rule upon this motion before turning to the remainder of the Claims. If further evidence is necessary on this issue, there should be a preliminary evidentiary hearing on the statute of limitations, before the parties go though discovery and have to prepare for a hearing on the merits.

## II.

## STATEMENT OF ANSWER

### Preliminary Statement

The causes of action against Respondents are entirely lacking in merit. Claimants assert 10 claims, namely, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, federal securities fraud, federal commodity fraud, securities fraud under Utah law, common law fraud, aiding and abetting common law fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing. Each of these claims is premised on Respondents' allegedly fraudulent misrepresentations concerning the nature and value of Claimants' investments. However, at no time did Respondents recklessly or intentionally make any materially false or misleading representations regarding Claimants' investments, nor were Respondents grossly negligent in their management of the commodity pool.

While Claimants allege that Respondents are responsible for their losses, in reality, any losses Claimants incurred are directly attributable to Claimants' own,

independent decisions as sophisticated investors to invest in a high-risk commodity pool whose value plummeted strictly due to market conditions.

## Background Facts

### Parties

Claimant (i) McCarthey Investments LLC is a Delaware limited liability company, (ii) JFM Holdings, L.P., is a Delaware limited partnership, and (iii) 2001 Jane F. McCarthey GRAT No. 5 is a trust organized under Alaskan law (hereinafter collectively, the "McCarthey Group" or "Claimants"). As attested to in their subscription documents, Claimants were all "qualified eligible persons" pursuant to Rule 4.7 under the Commodity Exchange Act (hereinafter "CEA").

Although not a party to this Arbitration, Mr. Todd Brashear (hereinafter "Mr. Brashear") is nonetheless crucial to an understanding of the facts underlying these claims. At all times relevant, Mr. Brashear was the McCarthey Group's appointed financial adviser with whom Respondents communicated on a regular basis.

The commodity pool at issue in this case is Linuxor Global Macro Fund, L.P. (hereinafter the "Fund"), a Delaware limited partnership formed in October 2001.

Respondent Linuxor Asset Management, LLC (hereinafter, "LAM"), is not the investment manager of the Fund as Claimants allege. Rather, LAM, a Delaware limited liability company, is the sole general partner of the Fund, and has been registered since December 2001 as a commodity pool operator with the Commodity Futures Trading Commission (hereinafter, "CFTC") under the CEA. At all times relevant to this proceeding, LAM was also a member of the NFA.

Respondent Linuxor Capital Management, LLC (hereinafter, "LCM"), is not the general partner of the Fund as Claimants allege. Rather, LCM, a Delaware limited liability company, was the commodity trading adviser to the Fund.

Respondent Abbas A. Shah (hereinafter, "Mr. Shah") is a principal of both LCM and LAM.

### Jurisdiction

Respondents dispute the alleged jurisdiction of this Panel based on the NFA Code of Arbitration Rule ¶ 6035. Respondents repeat and reallege their Motion to Dismiss the Claim as barred by such rule with the same force and effect as if fully set forth herein.

### Alleged Inducement to Invest in the Fund

In February 2002, Mr. Shah met with Mr. McCarthey to discuss Claimants' potential investments in the Fund. At this time, Mr. Shah explained to Mr. McCarthey the material risks of investing in the Fund. As a result of this meeting, Mr. McCarthey decided to invest in the Fund on behalf of all three Claimants. On March 13, 2002, Claimant 2001 Jane F. McCarthey GRAT No. 5 invested $1,500,000 in the Fund. On May 8, 2002, Claimants McCarthey Investments LLC and JFM Holdings, L.P. each invested $5,000,000. Claimants' cumulative investment in the Fund by May 2002 was $11,500,000. As of May 2002, Claimant 2001 Jane F. McCarthey GRAT No. 5's investment represented 11.535% of the total Fund, and Claimants McCarthey Investments LLC and JFM Holdings, L.P.'s investments each amounted to 42.944% of the total Fund. Claimants therefore represented a total of 97.423% of the Fund's capital as of May 2002.[4]

---

[4] There were ultimately two other participants who invested a total of $2,336,724.45 in the Fund. Both redeemed their investments in April 2004 for a total of approximately $2,300,000, and have not complained. Claimants redeemed their investments in early July 2004 for a total of $4,002,899.

From March 2002 through July 2004, the time in which Claimants were invested in the Fund, at no time did Mr. Shah make an oral stop-loss agreement with any of Claimants or their representatives, nor did Respondents ever suggest to Claimants that there were a large number of investors in the Fund. Claimants knew exactly how many investors were involved, and they knew that these investments were extremely risky with the potential for high returns but also the potential for large losses. In fact, Respondents were specifically told that Claimants were "big boys" who had "made bigger bets in Vegas."

Due to their sophistication, Claimants understood and expressly communicated to Mr. Shah their understanding of the fact that commodity pools such as the Fund are highly volatile vehicles where investors risk losing all of their money. The Fund's Confidential Offering Memorandum dated December 2001 (hereinafter the "Offering Memorandum") fully disclosed that participation in the Fund involved serious risks and was only available to sophisticated investors, and Claimants acknowledged this in their Subscription Agreements. Here, Claimants took the risk and lost. They cannot now seek to recover these losses from Respondents, who committed no fraud or misrepresentation, but rather fully informed Claimants of the risks.

### Alleged Concealment of the Fund's Losses

Claimants allege that Respondents failed to send any quarterly, annual or other reports concerning the performance or financial condition of the Fund. Claimants then inconsistently claim that Mr. Shah made materially false and misleading statements to Claimants regarding the financial condition of the Fund, and that certain annual reports were late. The truth is that at no time did Respondents conceal the Fund's losses from Claimants or Claimants' representatives. Respondents did not engage in any fraudulent

behavior, but at most failed to technically comply with some reporting provisions of the rules under the CEA.

Claimants' losses were the result of trading losses in the normal course of business. Respondents deny Claimant's allegation that Mr. Shah failed to inform Claimants of the Fund's losses in August 2002 or at any other time during the Claimant's participation in the Fund. To the contrary, from Claimants' first investment in the Fund in March 2002 through Claimants' withdrawal from the Fund in July 2004, Mr. Shah routinely, mostly weekly, sent performance emails and spoke with Claimants or their advisers. Therefore, none of the Claimants suffered any damages from any of the alleged technical reporting violations.

As set forth in Respondents' Motion to Dismiss, *supra*, in August 2002, Mr. Shah notified Claimants and Mr. Brashear that the Fund had recently suffered losses of approximately $3,500,000, or approximately 32%. However, Claimants elected to remain in the Fund despite their actual knowledge of the Fund's losses and of the high risk. Claimants cannot now claim that they were completely shocked to discover continuing losses in the Fund when they were clearly put on notice of its poor performance no later than August 2002.

As to Claimants' allegations that Respondents failed to provide quarterly statements, Respondents honestly but mistakenly thought that the Fund's administrator would be preparing all the required account statements for each participant, but the administrator never prepared any quarterly statements. Regardless of the fact that the technical reporting requirements may not have been satisfied, Mr. Shah was in regular oral

and email contact with Claimants or their representative regarding the Fund's performance, so Claimants did not suffer any losses as a result of these alleged technical violations.

Significantly, Claimants were on notice of this alleged deficiency in reporting requirements when they did not receive the initial quarterly statements in July 2002 for the quarter ending June 30, 2002; yet they never once complained. The more likely explanation for Claimants' complaints more than two years after the fact is that they were simply unhappy with the performance of the Fund. While the Claimants' losses are unfortunate, they do not amount to any actionable wrong by Respondents.

Respondents deny Claimants' allegations that the 2002 K-1 Schedules were not received by Claimants until September 2003. As indicated in covering letters dated August 12, 2003, The Fund's auditor mailed Claimants their 2002 K-1 Schedules (*see* *Exhibit A* to the Affidavit of Abbas A. Shah). In addition, on August 25, 2003, Mr. Shah faxed the 2002 K-1 Schedules to Mr. Brashear and also confirmed Mr. Brashear's receipt on the same day. Respondents had informed Claimants in advance that the Fund's auditor would be late with the Schedules and regularly updated them on the status of their accounts. The 2002 K-1 Schedules, though admittedly provided to Claimants late, were accurate and showed indisputably that Claimants had lost approximately 43% of their initial investments for the calendar year 2002.

Claimants also allege fraud in connection with two specific emails, the first of which Mr. Shah sent to Mr. Brashear on August 25, 2003. In their Statement of Claim, Claimants extrapolate language from the August 25, 2003 email over two years after it was written and state that the email is materially false and misleading. Claimants are wrong.

Mr. Shah sent many emails to Claimants and their representatives. Claimants have simply chosen one such communication to conjure a claim of fraud, ignoring the context.

The August 25, 2003 email was a response to Mr. Brashear's specific questions relating solely to Claimants' options and futures positions since the effective date of the 2002 K-1 Schedules and was not a misrepresentation about the overall account value. *See Exhibit B* to the Affidavit of Abbas A. Shah. In fact, when Mr. Shah stated, "We have thus far recovered more than half of the capital loss", he was referring specifically only to the options and futures positions per Mr. Brashear's direct inquiry. This is further evidenced by Mr. Shah's earlier statement in the email, "Please note that the capital invested through the end of the year *in some options and futures position* [sic] is shown as an unrealized loss which was completely reversed in the first week of January" (emphasis added). Respondents deny that they made any materially false or intentionally misleading statements in connection with this email.

Respondents have no record of any email sent on January 20, 2004 to which Claimants refer; rather, Respondents assume that Claimants must be referring to an email sent by Mr. Shah to Mr. Brashear on January 30, 2004. The January 30 email was sent informally by Mr. Shah late at night from his hotel while traveling on business, from memory, without access to his records or office. In this email, Mr. Shah inadvertently and mistakenly wrote the estimated account balance date as December 31, 2003 instead of October 31, 2003. *See Exhibit 1 hereto.* Mr. Shah estimated the $8,095,000 balance in reliance on the October 31, 2003 net asset value statement prepared by Citco Fund Services, the Fund's administrator, adjusted for estimated unrealized trading profits and losses. This was an honest mistake, not a materially false or deceptive statement as Claimants suggest,

and none of Claimants suffered damages as a result of this email.[5] In subsequent oral and email discussions with Mr. Brashear, Mr. Shah accurately informed him of the then current value of the Fund. If this informal email was an attempt to implement a scheme to defraud, it is difficult to imagine a more unlikely or less calculated method of deception.

These two isolated emails referred to by Claimants were sent five months apart and simply do not constitute fraud. Not only is it patently unfair to extrapolate and quote the language in those communications so that it seems misleading when taken out of context, but also two emails out of the numerous communications between the parties can hardly constitute the requisite intent on the part of Respondents to defraud Claimants.

Respondents similarly deny any fraud in connection with the valuation statements made by Mr. Shah in May 2004. Mr. Shah never represented to Claimants or their representative that the value of the Fund was either $8,200,000 or $9,500,000. All of Mr. Shah's emailed profit and loss statements to Claimants were based solely and entirely on the net asset value statements provided to him by the Fund's administrator.

On May 17, 2004, the value of the Fund was $5,383,123.26. On this date Mr. Brashear sent an email to Mr. Shah in which he stated, "Last week's profit was very good. Keep it up!" Furthermore, in this email Mr. Brashear requested a withdrawal on behalf of McCarthey Investments, LLC, in the amount of $500,000. The following day, Mr. Brashear cancelled the request and instructed him to keep the money in the Fund. This clearly indicated that Claimants were committed to investing in the Fund long after they became aware of the instances of which they now complain.

---

[5] Mr. Shah intended this email to be an informal estimate of Claimants' investments. It was hurriedly sent by Mr. Shah after 11:00 p.m. from a hotel internet center in Florida. This was not a calculated fraudulent act; rather, it was at most an oversight by Mr. Shah, which was remedied in subsequent communications with Mr. Brashear.

Furthermore, even after being contacted by the NFA regarding alleged technical improprieties, Claimants still expressed the desire to continue investing in the Fund without query or complaint. Notably, even after Claimants withdrew from the Fund suffering the financial losses they now attribute to Respondents, they expressed the desire to reinvest with Respondents, demonstrating their belief that Respondents did nothing wrong in connection with their previous investments.

On June 10, 2004, Mr. Brashear instructed Mr. Shah to liquidate the McCarthey Group's investments. On June 14, 2004, Mr. Shah wrote a letter to Mr. Brashear informing him that the policy as stated in section 5.1 of the Fund's limited partnership agreement required 90-days notice prior to withdrawal, which would occur at the end of a calendar quarter, in this case, September 30, 2004. However, Mr. Shah agreed to use his best efforts to allow the Investors to withdraw from the Fund earlier than September 30. In this letter, Mr. Shah also warned Claimants that a forced liquidation could impair the Fund's ability to maximize the return on the investment.

Mr. Shah never promised to complete Claimants' redemptions by June 30, 2004. He did, however, close the accounts on the earliest possible date and, in early July 2004, and returned $4,002,899 to Claimants. *See Exhibit C* to Affidavit of Abbas A. Shah. Claimants would have recovered significantly more had there not been an immediate liquidation. The value of their accounts on May 17, 2004 was $5,383,123.26, approximately $1,380,000 more than the value less than two months later at liquidation.

Claimants lost part of their money investing in a high-risk commodities pool. Claimants knew the high risks associated with this type of investment. They may not now

make unfounded accusations against Respondents more than two years after they were clearly on notice that their investments were dramatically dropping in value.

<u>Analysis of Alleged Claims</u>

None of the complaints set forth in the Statement of Claim amounts to a viable cause of action against Respondents. Because all of Claimants claims which arose prior to either October 25, 2003, or at least before August 26, 2003, are time-barred, Respondents cannot be held liable for any losses incurred prior to that date. Moreover, it is crucial to note that even if each of Claimants' alleged claims were true, Claimants suffered no losses from August 31, 2003 through early July 2004, when they redeemed their investments. On August 31, 2003, Claimants' investments were worth $3,657,962. In July 2004, Claimants' investments were worth $4,002,899. Since Claimants' investments rose in value, any possible claims accruing *within* the limitations period must also fail.

<u>Alleged Breach of Fiduciary Duty</u>

Claimants allege that Respondents breached their fiduciary duty by failing to comply with the investment policies in the Offering Memorandum, by failing to comply with oral statements allegedly made by Mr. Shah, by failing to be truthful in communications, and by failing to fulfill their responsibilities in the Fund's limited partnership agreement. Respondents deny that they in any way breached their fiduciary duty. None of Respondents ever engaged in an excessively risky trading strategy, although they were clearly entitled to implement any strategy they felt would be in the best interests of the Fund. Claimants were expressly warned at the outset that they may very well lose their entire investment as a result of this highly volatile trading strategy. At all times relevant, Respondents acted with the utmost duty of loyalty and good faith toward

Claimants, as evidenced by their constant oral and email communications with Claimants or their appointed representative regarding the status of Claimants' accounts.

Assuming, *arguendo*, that Respondents did commit a breach of their fiduciary duty, Claimants did not suffer monetary damages as a result. Any losses Claimants suffered after July 2002 cannot be attributable to Respondents' failure in communicating with Claimants since Claimants knew at that time both that their investments were decreasing in value and that Respondents had not sent them their "official" quarterly financial statement.

### Alleged Gross Negligence

Claimants allege that Respondents were grossly negligent in the management of the Fund's assets. Claimants point to language in the Offering Memorandum describing the Respondents' intended strategy as the appropriate standard of care to be applied in determining whether there was gross negligence. Even if this were the proper standard by which to measure gross negligence, the Offering Memorandum specifically provides: "[T]he investment strategies described elsewhere in this Memorandum may be altered without prior approval by, or notice to, the Limited Partners if the Investment Manager determines that such change is in the best interests of the Fund. Any such decision to engage in a new activity could result in the exposure of the Fund's capital to additional risks which may be substantial." Therefore, any of Respondents' representations concerning the expected strategy of Respondents with regard to the Fund could be changed at any time.

However, even in the absence of this language, Claimants may not adopt a contractual clause as the applicable standard of care in determining gross negligence. The

common-law standard for gross negligence in New York is always the same: it is a failure to use even slight care, or conduct that is so careless as to show a complete disregard for the rights and safety of others. *See Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992).

Respondents' conduct does not even remotely meet this standard. In fact, Respondents were diligent in their communications with Claimants and constantly strove to maximize the assets of the Fund, evincing a high regard for the Claimants' financial well-being. Mr. Shah was successful in the past, but even the most successful commodities traders inevitably experience occasional losses attributable to the volatility of the markets. Claimants were repeatedly warned that this was the case, and that Claimants stood the chance of losing their entire investment. The Fund was simply another unfortunate but fairly common example of a commodity pool dropping dramatically in value due entirely to market forces, not to any degree of negligence, let alone gross negligence, on the part of Respondents.

## Alleged Securities Fraud

Claimants allege that Respondents violated §10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by inducing Claimants to participate in the Fund through knowing or reckless material misrepresentations about how the Fund would be managed, the risk of loss to investors, the number of other investors in the Fund, and the size of the other investors' investments. Claimants further allege that Respondents induced them to stay in the Fund by making knowing or reckless material misrepresentations about the Fund's performance and the value of Claimants' accounts, by failing to provide quarterly and annual statements, and by

otherwise concealing materially adverse information about Claimants' investments in the Fund. Respondents wholly deny each of these allegations.

This cause of action is barred by the applicable statute of limitations. Since the enactment of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658, claims raised by private parties under the federal securities fraud statutes and regulations fall under a rigid statute of limitations which is two years after discovery of the alleged wrong, or five years after the alleged wrong, whichever is earlier. This limitations period is not subject to equitable tolling. *See Lampf,* 501 U.S. at 363. The statute of limitations begins to run upon either actual or inquiry notice of facts constituting fraud. *See Tregenza v. Great Amer. Comm. Co.,* 12 F.3d 717, 722 (7th Cir. 1993). Here, Claimants were undoubtedly on inquiry notice no later than August 25, 2003, the date on which Mr. Brashear confirmed to Mr. Shah that Claimants had received the K-1 Schedules for Claimants' accounts.

Even if the statute of limitations did not bar this cause of action, Claimants have failed to allege sufficient facts to constitute the elements of securities fraud under 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Claimants have not proven the requisite element of scienter to satisfy a particularized claim of securities fraud. Specifically, Claimants have not and cannot show that Respondents acted with the intent to deceive, manipulate or defraud, or that they were reckless in communicating misstatements to Claimants. Respondents did not at any time knowingly make a false statement of material fact, nor did Respondents ever evince a reckless disregard for the truth. Assuming, *arguendo,* that Respondents made a single, inadvertent misstatement of material fact among their innumerable emails and telephone conversations with Claimants, such a misstatement was

entirely accidental and inadvertent, and would have been remedied in subsequent conversations. Claimants have failed to allege even an inference of fraud in Respondents' activities and indeed cannot do so, as Respondents always acted in good faith with regard to Claimants' accounts.

Furthermore, Claimants ratified the conduct of Respondents by failing to object once they were on notice of the state of their investments after receiving their K-1 Schedules. Because Claimants continued to participate in the Fund long after they had actual knowledge of the value of their investments and the state of the Fund generally, Claimants cannot allege that they suffered losses through reliance on misstated facts which, had they known the truth, would have induced them to withdraw from the Fund.

### Alleged Federal Commodity Fraud

Claimants allege that Respondents violated § 4o of the Commodity Exchange Act, 7 U.S.C. § 6o, by inducing Claimants to participate in the Fund through knowing or reckless material misrepresentations about how the Fund would be managed, the risk of loss to investors, the number of other investors in the Fund, and the size of the other investors' investments. Claimants further allege that Respondents induced them to stay in the Fund by making knowing or reckless material misrepresentations about the Fund's performance and the value of Claimants' accounts, by failing to provide quarterly and annual statements, and by otherwise concealing materially adverse information about Claimants' investments in the Fund. Respondents deny each of these allegations.

This cause of action is also barred by the applicable statute of limitations. Private claims brought under the Commodity Exchange Act are subject to a two-year statute of limitations pursuant to 7 U.S.C. § 25(c). The Act specifies that this is two years

after the date the cause of action arises. In *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238 (7th Cir. 1991), the Court of Appeals held that for purposes of this statute of limitations, the cause of action arises at the time that the investor knows of and understands the amount of his losses and the reason for them, regardless of whether the investor's account remained open after this point in time. Likewise, in *Rotter v. Leahy*, 93 F.Supp.2d 487, 500 (S.D.N.Y. 2000), the court stated that the limitations period begins to run when "circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded" (quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2nd Cir. 1994). At that time, the court stated, the investor has a duty to inquire further, and if he does not, the court will impute knowledge to him. Here again, Claimants were on inquiry notice no later than August 25, 2003, the date on which Mr. Brashear confirmed with Mr. Shah his receipt of the K-1 Schedules for Claimants' accounts.

Even if the statute of limitations did not bar this cause of action, Claimants have failed to allege sufficient facts to constitute the elements of commodity fraud under § 4o of the Commodity Exchange Act, 7 U.S.C. § 6o. As with their securities fraud claim, Claimants have not proven, or even properly alleged, the requisite element of scienter to satisfy a particularized claim of commodity fraud. Furthermore, once again, Claimants ratified any alleged misconduct of Respondents by failing to object once on notice of the state of their investments after their receipt of the 2002 K-1 Schedule.

### Alleged Securities Fraud under Utah Law

Claimants argue that the aforementioned alleged misrepresentations and omissions also violate the Utah Uniform Securities Act, Utah Code Ann. §§ 61-1-1(2), 61-1-22(1) and (3). Respondents wholly deny this allegation.

This claim is also barred by the applicable statute of limitations. Private claims brought under the Utah Uniform Securities Act are subject to a two-year statute of limitations pursuant to Utah Code Ann. § 61-1-22(7)(a). The Act specifies that this is two years after the discovery of the facts constituting the alleged violation, or four years after the act constituting the alleged violation, whichever is earlier. As stated before, Claimants were on notice no later than August 25, 2003, the date on which Respondents confirmed with Mr. Brashear receipt of the 2002 K-1 Schedules for Claimants' accounts.

Even if the statute of limitations did not bar this cause of action, Respondents did not willfully make any false statement of material fact in connection with the sale of securities, nor did they omit to state any material fact. Any misstatement that may have occurred was entirely accidental and inadvertent, and not the result of a failure to exercise reasonable care. Furthermore, any alleged misstatement of material fact, if indeed there were any, would have been promptly corrected by Respondents in their frequent communications with Claimants or their appointed representative. Claimants suffered no losses in connection with this claim, as they continued to remain participants in the Fund long after the allegedly fraudulent statements were discovered to be untrue, so they suffered no losses in reliance on the alleged misstatements.

## Alleged Common Law Fraud

Claimants state that the aforementioned alleged misrepresentations and omissions also constitute common-law fraud on the part of LCM and LAM. Claimants further allege that they relied on Respondents' alleged misrepresentations in deciding to remain invested in the Fund and suffered monetary damages as a result. Respondents wholly deny these allegations.

Claimants have failed to allege sufficient facts to constitute the elements of common-law fraud. Once again, Claimants have not proven the requisite element of scienter to satisfy a particularized claim of common-law fraud. Specifically, Claimants have not and cannot show that Respondents acted with the intent to induce reliance on their alleged misstatements. Claimants cannot even raise a probable inference that Respondents were engaged in fraudulent activity. Respondents did not at any time knowingly make a false statement of material fact, nor did Respondents ever evince a reckless disregard for the truth. Furthermore, Claimants ratified the conduct of Respondents by failing to object once on notice of the state of their investments after their receipt of the 2002 K-1 Schedules.

### Alleged Breach of Contract

Claimants allege that LAM breached the Fund's limited partnership agreement by failing to provide audited annual financial statements or accurate valuation reports. Claimants further allege that had they received the reports, they would have liquidated their investment and averted substantial additional losses. Claimants also state that the oral 15% stop-loss policy and the policies set forth in the Offering Memorandum were implied terms of the limited partnership agreement and that failure to abide by those terms also constitutes a breach. Respondents wholly deny all of these allegations.

Respondents did not at any time breach their contract with Claimants. Respondents did provide annual audited financial statements as well as accurate valuation reports to Claimants. Claimants' allegation that they would have liquidated their accounts had they received the reports is entirely false. First, Respondents maintained constant communication with Claimants or their appointed representative updating Claimants on a

regular basis of the status of their investments, so they cannot truthfully claim they did not

know the value of their investments. Second, assuming, *arguendo*, that they did not receive

any updates, Claimants undoubtedly received their 2002 K-1 Schedules by August 25, 2003

which alerted them to the status of their accounts, yet they remained in the Fund for nearly

another year. Therefore, Claimants have failed to prove how these alleged breaches of

contract caused them to suffer any damages.

### Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing

Claimants allege that the 15% stop-loss policy promised by Mr. Shah, the

investment policies set forth in the Offering Memorandum, and the requirement to provide

accurate valuation reports were implied terms of the Fund's limited partnership agreement

and that Respondents willfully or recklessly failed to abide by those terms and so are liable

for a breach of the implied covenant of good faith and fair dealing. Respondents wholly

deny these allegations. All stated investment policies, whether oral or written, were subject

to change whenever Respondents felt it was in the best interests of the Fund under the terms

of the Operating Agreement. Therefore, if in fact Respondents changed their stated

investment strategy, they did not act inconsistently with the terms of the contract.

Furthermore, Respondents did not in any way act to destroy the rights of Claimants under

the limited partnership agreement but rather always acted with good faith and fairness in

their dealings with Claimants, Claimants' representatives and Claimants' investments.

## III.

## AFFIRMATIVE DEFENSES

Respondents respectfully request that the Statement of Claim be dismissed for the following reasons:

### First Affirmative Defense

Claimants are barred by the applicable statutes of limitations including, but not limited to, the two-year statute of limitations for NFA arbitrations under NFA Code of Arbitration Rule ¶ 6035, the two-year statute of limitations for private securities fraud actions under 28 U.S.C. § 1658, the two-year statute of limitations for private commodities fraud actions under 7 U.S.C. § 25(c), and the two-year statute of limitations for private actions brought under the Utah Uniform Securities Act, Utah Code Ann. § 61-1-22(7)(a).

### Second Affirmative Defense

The Statement of Claim is barred in whole or in part by the doctrines of laches, waiver, ratification and estoppel.

### Third Affirmative Defense

At all times relevant, Respondents acted in good faith, exercised reasonable diligence, and did not knowingly or recklessly misrepresent any material facts to Claimants. Claimants have failed to provide sufficient evidence to give rise to an inference that Respondents acted recklessly or with the willful intent to defraud Claimants.

### Fourth Affirmative Defense

Claimants are barred and estopped from recovery because Claimants understood the risks associated with investing in the Fund as well as the extent of the losses they sustained, yet Claimants continued to participate in the Fund.

### Fifth Affirmative Defense

Claimants are precluded from any recovery against Respondents because Claimants did not sustain any legally cognizable damages as a result of any of Respondents' acts or omissions. There is no connection alleged or provable between the purported fraudulent statements and any losses by Claimants.

### Sixth Affirmative Defense

Claimants are precluded from any recovery against Respondents because any damages sustained by Claimants were due to market forces.

### Seventh Affirmative Defense

Claimants were fully advised of and understood the speculative nature of their investments and knowingly assumed and accepted the risks entailed in making those investments.

### Eighth Affirmative Defense

Claimants never relied to their detriment on any matters, statements or omissions attributable to Respondents. Respondents' frequent communications with Claimants made their alleged failure to send timely reports or their alleged misrepresentations irrelevant in terms of causing any losses to Claimants.

### Ninth Affirmative Defense

The alleged technical reporting violations have been promptly and wholly rectified with no resulting losses to Claimants.

## IV.

## HEARING

Respondents' first choice of location for a hearing is New York, New York, as specified and agreed by all parties in a separate agreement. Respondents' second choice of location for a hearing is Chicago, Illinois. Respondents do not have any witnesses whom they intend to call at this time, but reserve the right to name witnesses in the future should the need arise. All exhibits are attached hereto. A check for $675.00 has been submitted to the NFA as required by NFA Code of Arbitration Rule ¶ 6041.5.

### <u>Conclusion</u>

Accordingly, Respondents Abbas A. Shah, Linuxor Asset Management, LLC, and Linuxor Capital Management, LLC request that the Claim be dismissed in its entirety with prejudice and that Respondents be awarded their costs and attorneys' fees, together with such other and further relief as the Panel deems just and proper.

**Dated:** New York, New York
December 22, 2005

**HARTMAN & CRAVEN LLP**
Attorneys for Respondents Abbas
A. Shah, Linuxor Asset Management,
LLC, and Linuxor Capital
Management, LLC

By: _Edward White/ap_
Edward A. White

A Member of the Firm
488 Madison Avenue
New York, New York  10022
Tel. No. 212/753-7500

## ATTESTATION

STATE OF NEW YORK          )
                           :  ss.
COUNTY OF NEW YORK  )

The undersigned certifies that the statements set forth in this pleading are true and correct.

For matters stated on information and belief, the undersigned certifies that he believes the

information to be true.

_____

Abbas A. Shah

Sworn to before me this
22nd day of December, 2005

_____
Notary Public

MICHAEL S. PARADISE
Notary Public, State of New York
No. 31-4977329
Qualified in New York County
Commission Expires February 4, 1985
2007